IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No: 2:21-CR-600-MBS |
| | ) | |
| vs. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF MOTION** |
| KARL H. ZERBST, JR. | ) | |

Defendant Karl Zerbst, Jr. ("Karl" or "Defendant") respectfully submits this memorandum in support of his Motion for downward departure and/or variance.

## TABLE OF CONTENTS

I.      Introduction to Karl H. Zerbst, Jr...........................................................................1

     A.      Family .............................................................................................................1

     B.      Education ........................................................................................................2

     C.      Military Service .............................................................................................3

     D.      Business Career..............................................................................................4

     E.      Community Service / Charitable Work / Volunteerism...................................5

     F.      Health / Medical Condition............................................................................7

     G.      No Criminal History ......................................................................................8

     H.      Community Support........................................................................................8

     I.      Full Restitution Paid ......................................................................................8

     J.      No Recidivism ...............................................................................................9

     K.      Commitment to Rehabilitation.......................................................................9

II.     The Charge and Recommended Guidelines Sentence .........................................9

III.    Sentencing Paradigm under <u>Booker</u>, <u>Gall</u>, USSG and 18 U.S.C. § 3553.........................11

IV.     A Downward Departure is Warranted ................................................................12

i

A.      Karl's Exceptional Historical Community Service, Charitable Endeavors and Volunteer Work Warrant a Downward Departure ...................................................12

B.      Karl's Post-Arrest Rehabilitation Warrants a Downward Departure ...................14

C.      Karl's Extraordinary Acceptance of   Responsibility for Extraordinary Restitution Warrant a Downward Departure ...........................................................................15

D.      Karl's Family Ties and Community Support Warrant a Downward Departure....................................................................................................................16

E.      Need to Avoid a Sentencing Disparity Warrants a Downward Departure ...........17

F.      A Downward Departure is Warranted Because any Guidelines Sentence of Incarceration is Greater than Necessary to Satisfy Sentencing Purposes .............18

G.      Karl's Past Exemplary Military Service Justifies a Downward Departure...........18

H.      Other Miscellaneous Mitigating Factors Warranting a Downward Departure....................................................................................................................20

I.      Foregoing Mitigating Factors, Independently and/or in Combination, Justify a Downward Departure ............................................................................................20

V.      A Variance is Warranted under 18 U.S.C. § 3553 ...........................................................21

A.      Section 3553(a)(1) Factors....................................................................................21

B.      Section 3553(a)(2) Factors....................................................................................25

C.      Section 3553(a)(3) Factors....................................................................................27

D.      Sections 3553(a)(4) and (a)(5) Factors .................................................................28

E.      Section 3553(a)(6) Factor .....................................................................................29

F.      Section 3553(a)(7) Factor .....................................................................................33

G.      Covid-19 Pandemic Considerations.......................................................................33

H.      Totality of the Circumstances Support a Variance ................................................34

VI.      Conclusion .......................................................................................................................35

# I.    INTRODUCTION TO KARL H. ZERBST, JR.

**A.  Family:**  Karl grew up in Charleston, South Carolina, first on James Island and then in North Charleston, with his parents, Karl, Sr. and Lunelle Ruth, and brother Chris.  His parents divorced when Karl was about ten years old, and both remarried. Karl's father died in 1996 due to a fatal heart condition, which runs in the family, and Karl is the primary family member providing care for his 90-year old mother, a former nurse, who resides by herself in a small villa located in West of the Ashley.

Karl has two daughters from his first marriage, Taylor and Lauren, and they are his pride and joy.  Karl was awarded custody of his daughters after the marriage dissolved through no fault of Karl's, and he lovingly raised his daughters from kindergarten through college.  Karl read them bed-time stories, fixed their meals, washed their clothes, maintained the household, helped them with their homework, took them to and from school, attended almost all of their sporting events which included many out-of-state tournaments, attended teacher-parent meetings, coached them in soccer and baseball, took them to doctors' appointments, took them to church, and did all of the myriad of things it takes to raise two young girls through college and beyond.  Due to his daughter Taylor's special needs, Karl spent considerable time with her.[1]

His daughters are now both married, and his daughter Lauren has blessed the family with a grandson.  Due to Lauren's heavy work schedule as a physical therapist, Karl provides child care for his 11-month old grandson two days per week, every week.

While Karl's mother, Lunelle, is relatively healthy for her advanced age, Karl visits her two or three times per week to assist and comfort her.  Karl reviews her mail,

---

[1] See **Exhibit C**, filed under seal.

pays her bills, monitors her retirement resources and financial investments, takes her to and from doctor appointments, buys her groceries or takes her to the grocery store, takes her on walks around her neighborhood, attends church with her, and generally provides love and emotional support because most of her peers are now deceased.

Karl has been very happily married to his wife Tami for almost 10 years.  Since they did not live in the same town at the time they met, they decided to take things slow and for 90 days talked on the phone and read through a daily devotion. This practice continues today, and both are committed to their daily devotions.  Karl's life revolves around his family.  See **Exhibit D**.

**B.  Education:**  Karl went to R.B. Stall High School and graduated in 1978 with classmate and best friend, Brady Hair.  Karl was twice voted the most valuable player on his high school football team, and was inducted to the school's Hall of Fame.  Karl graduated from The Citadel, The Military College of South Carolina, in 1982 with a B.S. degree in business administration. During his tenure at the Citadel, Karl played football his freshman year until he got hurt, volunteered as a tutor for struggling accounting students, and made the Dean's List multiple times.   In 1991, Karl obtained a Master's degree in Business Administration, also from the Citadel.  In April, 2018, Karl obtained a CCIM designation, which is the highest commercial real estate designation granted by the Certified Commercial Investment Member Institute.

**C.  Military Service:** During his junior year at the Citadel, Karl volunteered to serve in the U. S. Army National Guard which is sponsored by the State of South Carolina.  See www.nationalguard.com.  This enlistment required him to drill with his unit one weekend every month during his junior and senior years in college and attend

the Army National Guard's annual training at Fort Jackson located in Columbia, South Carolina. After Karl graduated from the Citadel in 1982, he spent 6 weeks at Ft. Bragg, North Carolina, graduated and received his commission as a 2nd Lieutenant. He immediately went to Fort Benning, Georgia, for another 16 weeks to attend the Army's Infantry Officer Basic Course, of which he also graduated. Karl spent three years in the Army National Guard.

In 1985, Karl volunteered in the U.S. Army Reserve.[2] Over the next 19 years, Karl rose through the ranks of 2nd Lieutenant, 1st Lieutenant, Captain, Major, and Lieutenant Colonel. During this time, he graduated from The U.S. Army Transportation Officer Advanced Course located in Fort Eustis, Virginia. He would go on to complete the Army's Combined Arms & Services Staff School, which prepares officers to function as members of a coordinated staff Battalion, Brigade & Division level organizations. He also graduated from the Army's Command & General Staff Officer Course in 2000. This course is a leadership development curriculum designed to educate field grade officers to be agile, innovative, and adaptive leaders in complex and uncertain environments for battle. Karl also commanded the 630th Transportation Company located in Orangeburg, South Carolina, as a Captain.

In 1991, Operation Desert Shield / Desert Storm, also known as the Gulf War, was waged by the United States and its allies against Iraq and its dictator Saddam Hussein for invading Kuwait. Tellingly, Karl volunteered to fight in the conflict and was activated and transferred to Saudi Arabia for a six-month assignment. Karl was in harm's

---

[2] www.goarmy.com.

way during this assignment as Saudi Arabia was a combat zone, and he put his life at risk in protection of his country. Fortunately, he came back in one piece.

Medals received during Karl's service to his country include the Southwest Asia Service Medal with 1 Bronze Service Star, Army Service Ribbon, Army Reserve Components Achievement Medal with 1 Oak Leaf Cluster, Army Achievement Medal, and National Defense Service Medal.  Karl received superlative evaluations from his military superiors.  See **Exhibit E**.

After twenty-two years of military service, Karl retired as an U.S. Army Reserve Lt. Colonel combat veteran in 2004 and was honorably discharged.[3]

**D.  Business Career:**

Karl had a successful career in business.  Starting in 1982, Karl was briefly employed as an accountant with a local CPA firm and controller with a local concrete company.  For almost twenty-two years, Karl was employed in the banking business here in the low country.  He worked as a commercial and retail lender for South Carolina National Bank, commercial bank manager for South Trust Bank, Market President for First Reliance Bank, and Market President for Ameris Bank.  After Karl retired from banking, he became licensed in real estate and insurance services.  He obtained each of these licenses in 2010. Karl retired his insurance license in 2020 to spend more time with his elderly mother.  He continues to be affiliated with Carolina One Real Estate Services.  Once the judgment of conviction is entered, Karl is expected to lose his real estate license.  Needless to say, Karl's reputation and standing in the business community have been severely, if not irreparably, tarnished as a result of his guilty plea, and, along

---

[3] Karl was unlawfully terminated from his civilian job after the Gulf War.  See **Exhibit F**.

with the expected loss of his livelihood, Karl has suffered emotionally, mentally,

physically and financially as a result of his conviction.

  **E.  Community Service / Charitable Work / Volunteerism:**  Karl has a long

and consistent history of community service, charitable endeavors and volunteerism.

Some examples of this are as follows:

- Past Chairperson (6 years), Board Member (8 years) – The Salvation Army of Berkeley, Charleston and Dorchester Counties
  - The Salvation Army is a bible-based Christian organization whose mission is to provide the homeless population with shelters, transitional housing, permanent supportive housing, and educational support, counseling and vocational services

- Council Member – St. Matthew's Lutheran Church
  - Karl has been a life-long, baptized member of St. Matthew's Lutheran Church
  - Served as an Acolyte as a teenager
  - Served on Church Council
  - Served on every ministry committee of the Church (Education Committee, Stewardship Committee, Programs Committee, Cemetery Committee & Finance Committee)
  - Sunday School Teacher in the Church's Youth Program (4 years)
  - Via de Cristo Participant & Counselor – a retreat to strengthen the faith of Christian leaders

- Coached little league soccer and baseball for his daughters' teams (4 years)

- Member – Association of Citadel Men -- Lifetime Member

- Past Treasurer, Board Member (2 years) -- Social Emotional Learning Alliance ("SELA")
  - SELA a non-profit state-wide organization that works with at-risk youths that have social emotional learning difficulties and dysfunction

- Past Treasurer, Member (19 years) – Charleston Rotary Club, Paul Harris Fellow

- o The Charleston Rotary Club is an organization whose mission is to promote fellowship among business professionals and provide community services and grant charitable funding around Charleston

- Past Board Member (3 years) – Mayor's Council for Homelessness
  - o This organization's mission is to find housing for displaced individuals in and around the City of Charleston.

- Past Board Member (6 years) – Charleston Affordable Housing Council
  - o This organization's mission is to find affordable housing for low income and displaced individuals in and around the City of Charleston

- Charleston Chamber of Commerce Member, Fund-raising committee (12 years)

- Member of the Congressional Medal of Honor Museum Founder's Society

- North Palm Community Church Project[4]

Karl has made financial donations to non-profit organizations over many years, including, but not limited to, the following: (1) American Lung Association; (2) Berkeley Animal Center; (3) Boy Scouts of America; (4) Charleston Animal Society; (5) Charleston Fire Firefighters; (6) Citadel Foundation; (7) Daughters of The Nile - The Shriners; (8) GEM Kids Mentoring; (9) Goodwill Industries of Lower South Carolina; (10) Habitat for Humanity; (11) Leukemia & Lymphoma Society; (12) Low Country Land Bank; (13) March of Dimes; (14) Mt. Pleasant Community Arts Center; (15) National Medal of Honor Heritage Foundation, Inc.; (16) National Multiple Sclerosis Society; (17) North Palm Community Church; (18) Seacoast Church; (19) Social Emotional Learning 4 South Carolina; (20) SPCA; (21) St. Matthew's Lutheran Church;

---

[4] Over the last two years, Karl successfully oversaw the financial management and construction of a new 16,000 square feet North Palm Community Church project located in North Charleston, and made substantial charitable contributions thereto. Karl secured financing for both the land purchase and the building construction. The Church has over 1,600 members and provides grief counseling, addiction counseling, financial counseling, emotional health counseling, adult and children Bible Studies, and has missions in the local region, South Africa, Costa Rica and Haiti. See www.northpalm.org. The church's pastor has offered to speak on Karl's behalf.

(22) The Salvation Army; (23) The Stray Dog Society; (24) Trident Academy; (25) Veterans of Foreign Wars; and, (26) YES Carolina.

Since the time Karl was charged, he has been volunteering with the East Cooper Community Outreach ("ECCO") program every week and with the Men's Work Crew at St. Matthew's Lutheran Church.  The ECCO program primarily provides food, clothing and medical assistance to homebound and/or lower income residents in the East Cooper area.  The St. Matthew's Work Crew is a volunteer group of parishioners who provide weekly maintenance to the Church's grounds and facilities.  Karl has also been assisting local Afghanistan refugees who have recently been admitted to the country.

**F.  Health / Medical Condition:**  While Karl appears to be in good health, he does, in fact, suffer from a serious, continuing heart ailment which has almost killed him. Prior to December, 2019, Karl was intermittently experiencing severe pain and pressure in his chest.  He sought medical treatment and was incorrectly advised that it was indigestion.  On the Sunday before Christmas, 2019, Tami left Karl in their bedroom for a few minutes and come back to find Karl collapsed in a lounge chair, totally unresponsive, gray, and not breathing.  Tami called EMS and performed CPR on Karl, and, miraculously he survived. He was ultimately diagnosed with vasospastic angina which is a condition where the arteries that supply blood to the heart have spasms.  It generally occurs when one is at rest.  When the coronary arteries spasm and constrict, the blood supply to the heart is dramatically reduced or blocked and results in cardiac pain and irregular heartbeats (arrhythmias), and, if not quickly treated, can result in cardiac arrest and death. Vasospastic angina is a chronic condition that cannot be cured.  Avoidance of emotional or physical stress, a low-fat diet, and exercise are ways to help minimize the

onset of the spasms. Once the coronary arteries begin to spasm, the patient must be immediately treated with nitrates and calcium channel blockers.

Unfortunately, Karl experiences vasospastic spasms and angina attacks every three or four days, and must have his nitroglycerin with him at all times. He has to take one nitroglycerin pill upon onset, and a second pill after five minutes if there has been no substantial reduction in chest pain. If the second pill does not work within five minutes after taking it, he must contact EMS to be transported to a hospital emergency room.

Karl's treating cardiologist, Dr. William B. Ellison, has indicated his concern that incarceration of Karl "could represent a significant increased risk to his health and his life." <u>See</u> **Exhibit G**, filed under seal. Dr. Ellison is available to the Court if needed.

**G. No Criminal History:** Karl has absolutely no criminal history other than the subject charge, and has otherwise lived an exemplary, law-abiding life.

**H. Community Support:** Karl has broad community support and a large network of friends to help him achieve full rehabilitation. **Exhibit B**, Letters of Support.

**I. Full Restitution Paid:** Karl has already provided extraordinary restitution by paying the full amount, $246,689.99, to the Clerk of Court at his guilty plea hearing. This sum is the full amount he received from the contractor as referenced in the Information and Plea Agreement.

**J. No Recidivism**: Karl has been evaluated by Dr. Thomas Martin and has been determined to be someone unlikely to commit any further criminal wrongdoing. <u>See</u> Dr. Martin's report, filed under seal as **Exhibit H**.

**K. Commitment to Rehabilitation:** Karl's history of community service and volunteerism is lengthy and impressive, and his loving care-taking services for his mother

and grand-child demonstrate his devotion to his family.  Karl is a loving father and husband, has considerable family and community support to help him through the rehabilitation process, and he has expressed deep-felt remorse for his misconduct.  Karl has demonstrated that he is committed to rehabilitation with continued community service.

## II.    THE CHARGE AND RECOMMENDED GUIDELINES SENTENCE

On September 10, 2021, Karl was charged in an Information with participating in a conspiracy in violation of 18 U.S.C. § 371. The allegations in the one-count Information, ECF # 1, are briefly summarized for the Court as follows:

> The Federal Home Loan Bank ("FHLB") had two related loan subsidy programs for lower income veterans or their spouses, to wit, the Energy Efficiency/Weatherization Rehabilitation Product ("EWP") and the Veterans Rehabilitation Product ("VRP") (collectively, the "Program").  The maximum subsidy was $12,500 per household, and the funds could be used to rehab such things as doors, HVAC, insulation, roof, windows, plumbing fixtures, ramps, driveways, handicap bathrooms, kitchens, and floor coverings.  After five years, the loans may be forgiven.  Local banks that sponsor the Program and provide funding often rely upon intermediaries (or coordinators) to locate participants, hire contractors for the rehab work, hire inspectors of the work, manage disbursements and engage attorneys to insure bank loan documents were properly executed and recorded.  Defendant Zerbst acted as an intermediary.

> There are Cost Estimates or Pre-Work Certifications provided to the bank for approval which identify and certify the proposed work to be done.  After funding is approved and the work completed, the intermediary, contractor and inspector have to sign Post-Work Certifications that they do not have a conflict of interest nor have they provided services for compensation to any of the parties to the transaction.

> Between 2014 and 2017, Defendant Zerbst conspired with others to violate the wire fraud statute (18 U.S.C. § 1343) and the statute prohibiting false statements to a bank in connection with a loan application (18 U.S.C. § 1014).  The overt acts of the conspiracy were that Defendant Zerbst signed and submitted 91 Program loan applications which contained false certifications that he had no conflict of interests with other parties to the transactions and had not provided services for compensation to other parties.  The certifications were false because Zerbst had a conflict of interest and had an undisclosed compensation arrangement with the contractor who paid Zerbst part of the contractor's profits (in 43 transactions totaling $246,689.99) from numerous Program projects.

On September 10, 2021, a plea agreement was also filed. ECF # 4. On November 3, 2021, Karl pleaded guilty to the foregoing single count Information. ECF # 21.

On January 12, 2021 a Pre-Sentence Report ("PSR") was issued by the U.S. Probation Office ("USPO"). On January 25, 2022, objections to the PSR were presented to the USPO by Karl's counsel. On January 31, 2022, a revised Pre-Sentence Report ("PSR-R") was issued by the USPO. The PSR-R calculated a Criminal History Category of I (0 points), and a Total Offense Level of 15 pursuant to the Guidelines as follows:

```
+  6    Base Offense Level per USSG § 2B1.1(a)(2)
+10     Adjustment for loss more than $150,000 per USSG § 2B1.1(b)(1)(F)
+  2    Role in Offense Enhancement per USSG § 3B1.3
-  2    Acceptance of Responsibility Adjustment per USSG § 3E1.1(a)
-  1    Additional Adjustment USSG § 3E1.1(b)
  15    Total Offense Level
```

The Guidelines recommended sentence set forth in the PSR-R is a sentence range of 18 to 24 months. While a 15 Total Offense Level, which is in Zone D of the Guidelines Sentencing Table, recommends a term of imprisonment, pursuant to 18 U.S.C. § 3561, a sentence of imprisonment is not required, and Karl's sentence can be completely served with probation and home confinement. For the reasons set forth above and below, a departure or variance, in support a sentence of probation and home confinement, are both authorized and appropriate under the Guidelines and Title 18, United States Code, Section 3553(a). This Court's sentence should be "reasonable," and, under the circumstances, the imposition of probation and home confinement, with conditions and community service, fits the reasonableness requirement. Gall v. United States, 552 U.S. 38 (2007).

### III.    SENTENCING PARADIGM UNDER BOOKER, GALL, USSG AND 18 U.S.C. § 3553

The Guidelines are now but one of seven statutory factors to weigh when formulating a sentence. United States v. Booker, 543 U.S. 220 (2005); 18 U.S.C. § 3553. In Booker, the Supreme Court held that the mandatory manner in which the Guidelines required courts to impose sentencing enhancements based on facts found by the court, by a preponderance of the evidence, violated the Sixth Amendment to the Constitution. The Supreme Court remedied the constitutional violation by severing two statutory provisions, 18 U.S.C. § 3553(b)(1) (requiring sentencing courts to impose a sentence within the applicable Guideline range), and 18 U.S.C. § 3742(e) (setting forth appellate standards of review for Guideline issues), thereby making the Guidelines advisory. Booker, 543 U.S. at 244-45. While no longer mandatory, Booker makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." Id., at 264.

First, the Court must establish the correct sentence under the Guidelines. Gall, 552 U.S. at 49; United States v. Blue, 877 F.3d 513, 517 (4th Cir. 2017). Second, the Court must allow the parties to argue for the sentence they deem appropriate. Gall, 552 U.S. at 49-50; Blue, 877 F.3d at 517-18. Third, the Court must consider all of the factors set forth in 18 U.S.C. § 3553(a), conduct an "individualized assessment" of the facts and arguments presented, and decide and impose an appropriate sentence. Gall, 552 U.S. at 50; Blue, 877 F.3d at 518; Rita v. United States, 551 U.S. 338, 351 (2007) ("In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").[5] Finally, the Court must adequately explain

---

[5] The District Court's lack of a presumption of reasonableness of a Guidelines sentence is not to be confused with any presumption of reasonableness an appellate court may apply. Rita, 551 U.S. at 351 ("Given our explanation in Booker that appellate 'reasonableness' review merely asks whether the trial court abused its discretion, the presumption applies

the chosen sentence. Id. The sentence must be "within the statutorily prescribed range and

... **reasonable**." United States v. Hughes, 401 F.3d 540, 546-47 (4th Cir. 2005) (emphasis

added).[6]

### IV.    A DOWNWARD DEPARTURE IS WARRANTED

A downward departure for a defendant is generally governed by Sections H and K

of the Guidelines, and there are multiple individual grounds supporting a downward

departure for Karl.

### A. Karl's Exceptional Historical Community Service, Charitable Endeavors, and Volunteer Work Warrant a Downward Departure

As noted above, Karl has a substantial past history of charitable good works, civic

community services, and volunteerism which warrant a downward departure. United States

v. Canoy, 38 F.3d 893, 906 (7th Cir. 1994) (charitable and civic activities may, if

exceptional, provide a basis for departure); United States v. Cooper, 394 F.3d 172, 176-

178 (3rd Cir. 2005) (departure and sentence of probation was warranted for defendant's

exceptional good works who made charitable contributions, ran a youth football team in a

depressed area, mentored its members, and helped several members attend better high

schools or go to college, which entailed "hands-on personal sacrifices which have a

dramatic and positive impact on the lives of others" ).

Karl's many community service, charitable and volunteer contributions are varied

and compelling.  As noted above, prior to his charge, Karl had volunteered his time and

---

only on appellate review."). The reasonableness of a sentence must take into account the
"totality of the circumstances." Gall, 552 U.S. at 38.
[6] The Court is "free to disagree, in individual cases and in the exercise of discretion, with
the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable
and carefully supported by reasons tied to the § 3553(a) factors."  United States v.
Ranum, 353 F.Supp.2d 984, 987 (E.D.Wis. 2005).

services for the Salvation Army, Charleston Rotary Club, SELA, Mayor's Council for Homelessness, Charleston Affordable Housing Council, Chamber of Commerce, Congressional Medal of Honor Museum, St. Matthew's Lutheran Church and North Palm Community Church. Over the years, Karl has financially supported an array of charitable entities, listed above, including the Citadel Foundation, March of Dimes, Boy Scouts, Goodwill, and Habitat for Humanity, to name a few. Karl also volunteered his time as a little league soccer and baseball coach. These volunteer efforts and contributions are most reflective of Karl's true character.

While § 5H1.11 of the Sentencing Guidelines states that "civic, charitable, or public service ... and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range[,]" the Introductory Commentary to Part H of the Guidelines provides that they "may be relevant to this determination in *exceptional* cases." (emphasis added). As explained by the Supreme Court, a court may still depart "if the [discouraged] factor is present to an *exceptional degree* or in some other way makes the case different from the ordinary case where the factor is present." Koon, 518 U.S. at 96 (emphasis added). This is clearly such a case.

There are numerous cases which stand for the proposition that a defendant's past civic and charitable contributions and good works can justify a downward departure. United States v. Greene, 249 F.Supp.2d 262, 264-265 (S.D.N.Y. 2003) (seven-level departure in part due to extraordinary charitable good works); United States v. Takai, 941 F.2d 738, 744 (9th Cir. 1991) (downward departure in part due to charitable acts-outstanding good deeds); United States v. Serafini, 233 F.3d 758, 776 (3d Cir. 2000) (community service and charitable works were sufficiently "extraordinary and

exceptional" to justify three-level downward departure for community and charitable activities); United States v. Woods, 159 F.3d 1132 (8th Cir. 1998) (defendant's exceptional charitable efforts – bringing two troubled young women in her home, paying for them to attend private high school – and also assisting elderly friend to move from nursing home to apartment – justified a departure); United States  v. Jones, 158 F.3d 492, 500-501 (10th Cir. 1998) (defendant's long history of community service in part justified departure). Karl's outstanding body of work as a community service volunteer is certainly exceptional and warrants a departure.

### B. Karl's Post-Arrest Rehabilitation Warrants a Downward Departure

Karl has demonstrated extraordinary post-arrest rehabilitation with additional civic good works, including his volunteer services with the ECCO program, St. Matthew's Work Crew, and Afghanistan refugee assistance.   Likewise, while his care-taking services for his mother and grandson might not necessarily be considered "community service," these volunteer efforts in support of his family members should demonstrate to the court the true nature of his character and is certainly reflective of a person who is continuing to rehabilitate himself. Furthermore, Karl has expressed heart-felt remorse to the Court, and has vowed to never break the law again.  **Exhibit A**, Letter of Apology.

"[C]ourts have recognized *post-arrest* conduct may justify a departure even though section 3E.1.1 rewards acceptance of responsibility."  United States v. Sally, 116 F.3d 76 (3rd Cir. 1997) (emphasis added); United States v. Whitaker, 152 F.3d 1238 (10th Cir. 1998) (post-offense rehabilitation may be a basis for downward departure); United States v. Watson, 2000 WL 1840080 (D.Me. Dec. 14, 2000) (unpublished) (recognizing departures for post-offense, pre-sentence rehabilitation); United States v. Brock, 108 F.3d

31 (4th Cir. 1997) (same); <u>Pepper v. United States</u>, 562 U.S. 476 (2011) (even post-sentencing rehabilitation may be taken into account); <u>United States v. Walker</u>, 252 F.Supp.3d 1269, 1306-7 (D.Utah. 2017) (post-offense rehabilitation regarding drug addiction, family support network, and age support a home confinement sentence in bank robbery case); <u>United States v. Goldberg</u>, 295 F.3d 1133, fn. 3 (10th Cir. 2002) (extraordinary community service, collateral employment consequences of conviction, and extraordinary post-conviction rehabilitation justified a downward departure); <u>United States v. Greene</u>, 249 F.Supp.2d 262 (S.D.N.Y. 2003) ("Greene is entitled to a downward departure for his charitable works."); <u>United States v. Wilke</u>, 156 F.3d 749 (7th Cir. 1998) (community ties and charitable good works may be considered factors in support of a downward departure in extraordinary cases).

Because Karl has demonstrated exceptional post-arrest rehabilitation along with deep-felt expressed remorse, a downward departure is in order.

### C. Karl's Extraordinary Acceptance of Responsibility for Extraordinary Restitution Warrants a Downward Departure

Karl should be granted a downward departure for extraordinary acceptance of responsibility with respect to his extraordinary efforts to voluntarily pay full restitution. Extraordinary restitution efforts are not a prohibited factor to consider for a downward departure under the Guidelines. At most, they are a discouraged factor. In <u>United States v. Hairston</u>, the Fourth Circuit Court of Appeals held that restitution was a discouraged factor but could still be the basis of a downward departure because it was a factor considered under USSG § 3E1.1, note 1(C). 96 F.3d 102 (4th Cir. 1996). Other courts have agreed with the Fourth Circuit's assessment. <u>United States v. Kim</u>, 364 F.3d 1235, 1242 (11th Cir. 2004) ($280,000 restitution was extraordinary enough to justify departure

from 24 months to probation); <u>United States v. Miller</u>, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure).

Under the holdings of <u>Hairston</u> and <u>Kim</u>, extraordinary voluntary restitution may be the basis for a downward departure.  As such, Karl's extraordinary acceptance of responsibility in providing full restitution is a reasonable basis for a downward departure.

### D. Karl's Family Ties & Community Support Warrant a Downward Departure

As the Court will learn at sentencing, Karl's family and friends have promised to provide the emotional and communal support Karl may need to rehabilitate himself and re-assimilate into society and avoid repetition of the offensive conduct.[7]  The extent of a family's and friends' social support to ensure a defendant's rehabilitation is a recognized factor in sentencing post-<u>Booker</u>.  In <u>United States v. Wachowiak</u>, 496 F.3d 744 (7th Cir. 2007), the sentencing judge's imposition of a non-Guidelines sentence upon a defendant was upheld, in part, because of "the positive role [Defendant's] family members, who promised to aid in his rehabilitation and reintegration into the community and support his efforts to avoid reoffending."  In <u>Wachowiak</u>, the defendant's Guidelines sentence was cut by more than half.  <u>Id.</u> (sentencing court believed mitigating circumstances outweighed aggravating ones wherein defendant cooperated with government, gave a detailed confession, expressed sincere remorse, and pleaded guilty in a timely fashion, posed little

---

[7] <u>See</u> **Exhibit B**, Letters of Support, attached.

risk of re-offending, was motivated to change).[8]  So too, Karl's family and community support system should be considered as a basis for a departure in this case.

### E.  Need to Avoid Disparity in Sentencing Warrants a Downward Departure

To the extent that the Court can consider the need to avoid sentencing disparities among similarly situated defendants, a downward departure is warranted.  United States v. Ahuama, 686 Fed.App'x 82, 85 (3rd Cir. 2017) (affirming district court decision that had granted "a downward departure on grounds that it deemed meritorious: to 'avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.'").  As set forth below in the Section 3553(a)(6) analysis, there are a number of similarly situated defendants in financial fraud cases in which sentences of probation and/or home confinement have been imposed in South Carolina, and nationwide.  Notably, in the cases of United States v. Bradshaw, Case No. 8:16-cr-366-1 (D.S.C.) and United States v. Cabral-Rice, Case No. 8:16-cr-366-2 (D.S.C.), the defendants were both convicted of conspiracy to commit wire and bank fraud involving a low-income housing rehabilitation program.  These defendants forged signatures of contractors on funding certifications, submitted false certifications on false draw requests with inflated costs, split profits, and the loss amount was $316,547.35, yet both defendants were sentenced to probation.

Under the circumstances, it would be appropriate to depart downward to avoid disparate sentencing treatment of Karl.

---

[8] Like the defendant in Wachowiak, Karl's mitigating circumstances outweigh any aggravating ones; he cooperated with government, gave a detailed debriefing, expressed sincere remorse, pleaded guilty in a timely fashion, is motivated to change, maintained gainful employment since charged, worked diligently to pay full restitution, continued community volunteer and family care-taking services, and poses little risk to society.

**F.  A Downward Departure is Warranted Because any Guidelines Sentence of Incarceration is Greater Than Necessary to Satisfy Sentencing Purposes**

A Guidelines sentence of any time in prison for Karl is "far greater than necessary" to satisfy the purposes of sentencing. "Courts have long recognized that where the sentence called for by the guidelines would result in punishment *greater than necessary, the court can depart downward*."  United States v. Redemann, 295 F. Supp. 2d 887, 896 (E.D.Wis. 2003) (emphasis added).  Courts have also recognized the concept that a Guidelines sentence can substantially overstate the seriousness of a crime and, thus, be a proper basis for a downward departure.  United States v. Brennick, 134 F.3d 10, 15 (4th Cir. 1998) ("notion … that the loss table may under- or overstate the seriousness of the offense is little more than another way of saying that departures … may be warranted for good cause."); see also, USSG § 4A1.3(b)(1) (downward departure may be warranted when criminal history substantially over-represents the seriousness of the crime or the likelihood that the defendant will commit other crimes).

Karl has no prior criminal history, is not a threat to society, is highly unlikely to repeat his misconduct, has cooperated fully, has already voluntarily paid full restitution at his plea hearing, and has a long history of extraordinary volunteer good works, post-arrest rehabilitation and deep-felt remorse.

Karl simply should not be sentenced to incarceration in prison for his conduct because such a sentence would be greater than necessary to accomplish the purposes of sentencing given the totality of the circumstances.

**G.  Past Military Service Justifies a Downward Departure**
As noted above, Karl honorably served his country as a member of the U. S. Army National Guard and U. S. Army Reserve for over twenty years.  He is a decorated

war veteran who put his life on the line for his country in the Gulf War.  Karl's past

military service justifies a downward departure in this case.

USSG § 5H1.11 provides that "military service may be relevant in determining

whether a departure is warranted, if the military service, individually or in combination

with other offender characteristics, is present to an unusual degree and distinguishes the

case from the typical cases covered by the guidelines." Moreover, past military service

has been acknowledged as a basis for downward departures by a number of courts.  The

Eighth Circuit Court of Appeals just recently upheld a downward variance which was

based in large part upon the defendant's military service.  United States v. Davis, Case

No. 21-1283 (8th Cir. Dec. 20, 2021).  The district court's statement of reasons were:

> Upon its own motion, the Court finds that a downward variance or non-Guideline sentence is appropriate in this case. The Defendant, who is 55 years old, has a criminal history category of I, based upon zero (0) criminal history points. He honorably served, with commendations, in the United States Marine Corps for twenty years. Since January 2020, the Defendant has been on pretrial supervised release without incident and has been successfully employed on a full-time basis. He has expressed deep remorse for the offense conduct in this case.

Id. (emphasis added).  The reasons for the court's downward variance are remarkably

similar to those put forth by Karl, a 20-year decorated veteran who served in the Gulf

War.  See also, United States v. Falls, Criminal Case No. 14-CR-74, ECF # 67 (N.D.

Iowa Dec. 29, 2014) (departure granted due to past military service); United States v.

Johnson, 464 F. Supp. 3d 22, 41, n.4 (D.D.C. 2020) (departure granted due in part to past

military service); United States v. Pipich, 688 F. Supp. 191, 193 (D.Md. 1988) ("a

person's military record is a relevant factor to be considered at sentencing, because it

reflects the nature and extent of that person's performance of one of the highest duties of

citizenship"); United States v. McCollum, 558 U.S. 30, 43 (2009) ("Our Nation has a long tradition of according leniency to veterans in recognition of their service").

### H. Other Miscellaneous Mitigating Factors Warranting Downward Departure

There are other miscellaneous mitigating factors which are applicable in Karl's case to justify a downward departure post-Booker, including the following: (1) Karl has an exemplary employment record;[9] (2) Karl has already suffered considerable damage to his reputation;[10] (3) Karl will likely lose his real estate license as a result of his conviction, and will therefore likely lose his real estate broker job;[11] (4) Karl is unlikely to reoffend.[12]

### I. Foregoing Mitigating Factors, Independently and/or in Combination, Justify a Downward Departure

Therefore, based upon the foregoing mitigating factors, when considered independently and/or in combination, a downward departure from the advisory Guidelines range which eliminates incarceration is appropriate in this case. A departure to a sentence of probation and/or home detention may satisfy the entire minimum term. USSG §

---

[9] Exemplary or extraordinary employment history can support a downward departure. United States v. Handy, 752 F.Supp. 561, 564 (E.D.N.Y.1990); United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008); United States v. Big Crow, 898 F.2d 1326, 1331 (8th Cir. 1990); and, United States v. Jones, 158 F.3d 492, 498 (10th Cir. 1998).
[10] United States v. Anderson, 533 F.3d 623, 633 (8th Cir. 2008).
[11] United States v. Gaind, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); United States v. Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); United States v. Samaras, 390 F. Supp. 2d 805, 809 (E.D.Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).
[12] United States v. Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (below Guidelines sentence due in part to unlikely to reoffend and veteran's service).

5C1.1(b).  Such a departure is warranted given the exceptional individual and combined mitigating factors of this case, and is certainly reasonable under the circumstances.

### V.    A VARIANCE IS WARRANTED UNDER 18 U.S.C. § 3553

Even if the Court were to decide that a departure based on the Guidelines was not applicable, the Court may vary from the advisory Guidelines to impose any reasonable variant sentence based on a consideration of the § 3553 factors.  Booker, 543 U.S. at 246, 263-64.  As analyzed below, a variance from the Guidelines is warranted, and a sentence of probation and home detention with reasonable conditions, is authorized and appropriate under the facts and circumstances of this case.

The factors set forth in 18 U.S.C. § 3553(a), are as follows:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [by the] guidelines or policy statements…
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

### A.  Section 3553(a)(1)

The first set of factors in §3553(a)(1) -- the nature and circumstances of the offense and the history and characteristics of the defendant – favors Karl.

With regard to the nature and circumstances of the offense, the subject unlawful conduct to which Karl pleaded guilty is a <u>non-violent</u>, <u>economic</u> <u>offense</u>. Karl was improperly taking payments from the contractor who was doing the subject renovations, and then improperly certified that he had no financial interest in the project nor any conflict of interest on the bank loan documents. Karl offers no excuse for his unlawful conduct and his lapse in judgment, and he has accepted full responsibility for his actions, sincerely apologized, expressed deep remorse, and paid full restitution. While not an excuse for his misconduct, the fact remains that the owners of the subject properties did receive their anticipated renovations which substantially improved the condition and value of their homes. To this day, we are not aware of any complaint regarding the quality of the work performed. **<u>Exhibit I</u>**.

With regard to the history and characteristics of the defendant, Karl has been happily married to his wife Tami for almost ten years, and is a man clearly devoted to his family. The fact that he was awarded primary custody of his two girls after his divorce speaks volumes as to his devotion to his family and his general reliability. He lovingly raised both girls, Lauren and Taylor. He was particularly attentive to the special needs of his daughter, Taylor, and helped guide her through her formative years and gave her the parental support she needed to develop into the fine young lady she is today. He was equally devoted to his daughter Lauren. Now, as a sixty-one year old grandfather, Karl cares for his grandson two days per week due to Lauren's heavy work schedule, and

likewise attends to his elderly mother several times per week with love, emotional support and general care-taking support.

A Charlestonian all of his life, Karl successfully and voluntarily served in the military for over twenty years, and rose to the rank of Lt. Colonel. He was given high marks from his military superiors, who deemed him "a professional of the highest caliber" who had "unlimited potential" and should be "selected for Battalion Command." **Exhibit E**. Karl is a decorated war veteran, having put himself in harm's way during the Gulf War in 1991 to faithfully serve his county. That he was willing to die for his country shows Karl's true, selfless character.

Karl has long been a civic volunteer for the betterment of his community. As noted above, he has generously contributed his time, efforts and finances to civic and charitable causes throughout his career. His volunteer work with the Salvation Army, Rotary Club, Chamber of Commerce, Affordable Housing Council, Council for Homelessness, little league sports, and St. Matthew's Church is truly reflective of Karl's charitable and big-hearted nature. Karl has tried in the best manner he could to atone for his transgressions by continuing his volunteer efforts since being charged, by volunteering with the ECCO program and Men's Work Crew at St. Matthew's Lutheran Church, as well as assisting Afghan refugees. Karl's past and current body of volunteer civic work bespeaks his true nature.

Other than the case at bar, Karl has led an otherwise exemplary, law-abiding life of hard work. Karl diligently worked his way up from a staff job to that of a local bank market president. Karl demonstrated exemplary commitment to employment and continued to work in the real estate and insurance professions after retiring from banking. Karl had no

silver spoon but relied upon his industriousness and perseverance in both his business and military career.

Karl has no prior criminal history whatsoever, and has been evaluated by Dr. Thomas Martin as a low risk to reoffend: "It is therefore this Examiner's opinion to a reasonable degree of medical and psychiatric certainty that Mr. Zerbst poses a minimal risk to criminally reoffend." **Exhibit H**.

Many Letters of Support provide insight into Karl's good character, long history of charitable/volunteer endeavors, and family/community ties. Here are a few excerpts:

> Throughout his business career and while raising two daughters who have become fine young women, Karl was always involved in civic, church, and community organizations. In fact, I have never met anyone who actively participated in as many such organization over as many years as he has.[13]

> Karl has always worked very hard to provide for his daughters and he is a man of integrity and hard work. I remember on many occasions Karl would bring a bank meeting to closure so he would not be late in picking his daughters up from kindergarten or grammar school…. He never complained, he did what he had to do for our daughters.[14]

> I cannot think of another person who has helped people more than him. His genuine interest in helping comes naturally and he has blessed many people in his life…. Both personally and professionally, he is genuine in his demeanor, never boastful, always humble. Financial success is secondary to him. He made a mistake and has taken full responsibility.[15]

> I hope to try to paint a picture for you of who Karl is besides what you see on paper…Karl is one of the best men that I have ever known. He is loyal, kind, hard-working and is a caretaker for everyone he meets. He genuinely loves people….He is an encourager and a motivator, and he is the epitome of a Good Father.[16]

> Our dad continues to fulfill the title "father" in all possible areas. We are eternally grateful God granted us with him….It has been a privilege to see him eagerly taking

---

[13] **Exhibit B**, Letter of Support – Connie Best.
[14] **Exhibit B**, Letter of Support – former wife Cathy Nielson.
[15] **Exhibit B**, Letter of Support – Geoffrey Smith.
[16] **Exhibit B**, Letter of Support – Kelli Wadsten.

on this new role [of grandfather] with just as much energy and commitment to his grandson as he has shown his two daughters all our lives. He remains committed to family, values, quality time and going above and beyond to any who needs him. His presence in our lives is important and necessary. We continue to look to him for guidance, trust, stability, support and love.[17]

Karl has the full support of his family and friends to provide the guidance which may be necessary for him to achieve full rehabilitation from his misconduct during a period of probation and/or in a home confinement setting. Karl respectfully asks this Court to grant a variance based on his personal history and characteristics, including the increased health risks of incarceration due to his heart condition, as well as the nature and circumstances of his conduct. The Fourth Circuit has upheld a sentencing variance based on these factors pursuant to Section 3553(a). United States v. Pauley, 511 F.3d 468, 469 (4th Cir. 2007).

### B.  Section 3553(a)(2)

The second set of factors in § 3553(a)(2)(A)-(D) addresses several traditional sentencing considerations. A probationary and/or home confinement sentence would still reflect the seriousness of the offense, promote respect for the law, deter future criminal conduct, and provide just punishment for this economic offense because Karl's liberty would be impaired by the typical restrictions imposed with either such sentence. In this case, there is no indication of a need to protect the public from further criminal conduct by Karl. He is a non-violent offender who is highly unlikely to repeat his misconduct, he presents no danger to the public, and Karl has demonstrated atonement and has become more focused on leading a law-abiding life. Karl is committed to rehabilitating himself and again becoming a productive member of society. He has a long and continuing body

---

[17] **Exhibit B**, Letter of Support – daughters Lauren von Lehe and Taylor McLemore.

of volunteer work, has faithfully served his country, has had an exemplary employment record, has strong community support, and continues to devote his love and attention to his family, including his elderly mother and young grandson.

The "most effective manner" to provide Karl further rehabilitation would be through a probationary and/or home confinement sentence. There is simply no indication of a need to incarcerate Karl as punishment for his crime.

While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), it is not necessary to imprison Karl to accomplish that goal. Many Courts have recognized that the collateral consequences of a conviction can serve as a powerful deterrent to potential criminals. United States v. Edwards, 595 F.3d 1004, 1016 (9th Cir. 2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration" and upholding District Court's determination that probation and restitution provided adequate deterrence, despite the defendant's guidelines range being 27-33 months imprisonment); United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing Court properly considered that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession (internal quotation marks omitted)); United States v. Anderson, 533 F.3d 623, 633 (8th Cir. 2008) (Court properly considered "atypical punishment such as the loss of [defendant's] reputation"); United States v. Sachakov, Case No. 11-CR-120, 2013 WL 101287, at *3 (E.D.N.Y. Jan. 8, 2013) (fact that defendant was likely to lose medical license relevant to setting appropriate sentence); United States v. Adelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

Research on deterrence and criminal sentencing also indicates that, particularly for white collar criminals, "informal sanctions (such as social censure, shame, and loss of respect)" are "equally important [as imprisonment] in producing the deterrent outcome." Zvi S. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). There is no empirical evidence that lengthy sentences of incarceration provide an additional deterrent effect. Id. (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"). Sentencing Courts have recognized the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." Adelson, 441 F.Supp. 2d at 514.

Given Karl's circumstances, incarceration under the Guidelines sentence is not necessary for deterrence, to promote respect for the law, to reflect the seriousness of the crime, or to provide a just, reasonable punishment.[18]

## C.  Section 3553(a)(3)

The third factor in § 3553(a)(3) -- the kinds of sentences available – encourages the Court to consider sentencing options, such as probation and home confinement, in addition to imprisonment.   Both of these sentencing options are available to the Court.  Here, for the reasons stated above and below, a sentence of probation and/or home confinement, with appropriate conditions, is certainly "reasonable" and therefore authorized under Booker.

---

[18] Karl is certainly not asserting his crime is not a serious offense.  He just earnestly believes that, under his unique mitigating circumstances which are exceptional and outside of the heartland of cases, the Guidelines incarceration penalty for his conduct is excessive.

In <u>Gall</u>, 552 U.S. at 48, the United States Supreme Court recognized the fact that probation is not an act of leniency and is a severe imposition on one's liberty, and approved a 100% departure from the Guidelines range to probation, and noted as follows:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. **Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.** <u>See</u> <u>United States v. Knights</u>, 534 U.S. 112, 119, (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. (emphasis added)

It is respectfully submitted that a probationary, non-incarceration sentence that would significantly limit Karl's freedom, combined with the usual conditions of probation and/or home confinement, would constitute adequate punishment for Karl, and would also serve as a forceful, tangible reminder to the community of the seriousness of the offense.

### D.  Sections 3553(a)(4) and (a)(5)

The fourth and fifth factors in § 3553(a)(4)-(5) require the Court to consider the Guidelines and USSG Policy Statements applicable to the case.  The Guidelines and Policy Statements are thoroughly discussed above in the departure section.  A downward departure is warranted based upon Karl's historical community service good works and volunteerism, Karl's deeply expressed remorse, Karl's extraordinary acceptance of

responsibility for voluntary paying full restitution at his guilty plea hearing, Karl's strong family ties and community support, the need to avoid sentencing disparity, the fact that the Guidelines sentence is greater than necessary to satisfy sentencing purposes and overstates the seriousness of the misconduct, as well as the other factors and mitigating circumstances set forth above and below, and a sentence of probation and/or home detention under the Guidelines is authorized.[19]   Again, even if the Court were to conclude that a Guidelines departure was not technically available, a variance based upon the same factors and considerations set forth above would still certainly be warranted and reasonable. The Guidelines range of 18 to 24 months incarceration is neither mandatory nor should such a sentence be presumed reasonable. Nelson v. United States, 129 S.Ct. 890, 892 (2009). The Guidelines are just one of many factors this Court must consider. This Motion and memorandum sets forth ample support for both a Guidelines downward departure and/or a downward variance in this case, and clearly support a sentence of probation and/or home confinement.

### E.  Section 3553(a)(6)

The sixth factor in § 3553(a)(6) focuses on sentencing disparity among similarly situated defendants.   In this case, while all of the aforesaid mitigating circumstances justifying a departure or variance are extraordinary factors that distinguish this case from the heartland of similar fraud-type cases, a review of similarly situated defendants sentenced for fraud or financial crime charges demonstrably support a probationary sentence in Karl's case.

---

[19] "After Booker,...that a factor is discouraged or forbidden under the [G]uidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the [G]uidelines."  United States v. Husein, 478 F.3d 318, 326 (6th Cir. 2007).

Two recent cases in the District of South Carolina are almost exactly factually comparable to Karl's case, and both defendants received probation.  See United States v. Bradshaw, Case No. 8:16-cr-366-1-BHH, ECF # 54 (D.S.C. Dec. 14, 2017); United States v. Cabral-Rice, Case No. 8:16-cr-366-2-BHH, ECF # 64 (D.S.C. Mar. 28, 2018).  Both Bradshaw and Cabral-Rice pleaded guilty to a § 371 conspiracy to commit wire and bank fraud against Federal Home Loan (FHL) Banks relating to the Housing Trust Fund program designed to fund rehabilitation of low-income homes.  Bradshaw was the executive director, and Cabral-Rice was the director of federal programs, of a non-profit organization, the Fresh Start Community Development Corporation, which repaired low-income homes with grants from FHL Bank. These defendants forged the signatures of contractors on funding certification, submitted false certifications on false draw requests with inflated costs, and split the profits.  The loss amount attributable to each of these defendants was $316,547.35, which was about $70,000 more than the loss attributable to Karl.  Judge Hendricks sentenced Bradshaw to probation for five years, and sentenced Cabral-Rice to probation for three years.  In stark contrast to Karl, neither Bradshaw nor Cabral-Rice paid any restitution prior to being sentenced.  Because the Bradshaw and Cabral-Rice cases are so factually similar to Karl's case, and have an even greater loss amount, Karl should likewise be sentenced to probation, particularly since he has paid full restitution.

A sampling of cases from across the country indicate that fraud or financial crimes defendants with similar or greater offense levels and/or loss amounts have been sentenced to probation and/or home confinement.

In United States v. Warner, Case No. 1:13-cr-731, ECF # 30 (N.D.Ill. Jan. 14, 2014), the defendant was sentenced to two years' probation for tax fraud relating to $107

million in concealed off-shore accounts.  Warner's recommended Guidelines range was 46 to 57 months, an offense level of 23 and criminal history of I, but the sentencing court granted a variant sentence to probation, in part due to his past charitable good works and community service and his payment of restitution.  The Seventh Circuit Court of Appeals upheld the probationary sentence, noting that the district court relied on Warner's past charitable good works and community service, as well as the humiliation already suffered, lack of criminal history, payment of his civil liabilities, and the court's view that Warner "was extremely unlikely to commit any further crimes."  United States v. Warner, 792 F.3d 847, 854 (7th Cir. 2015).

The mitigating factors justifying probation in Warner's case are extremely similar to Karl's.  Karl has a long history of community charitable and volunteer service, has demonstrated post-arrest rehabilitation in continuing his volunteer services, has paid restitution in full, has already been severely humiliated as a result of his guilty plea and the negative press regarding the same, has fully cooperated and accepted responsibility for his actions, has no other criminal history, has no history of violence, has many supporters vouching for his good character and integrity, has strong family ties, and is highly unlikely to commit any further crimes.  Under the circumstances, imposing probation and/or home confinement on Karl, with typical conditions including community service, would be, as in the case of Warner, quite "reasonable" and "'sufficient, but not greater than necessary' to accomplish the basis purposes of sentencing:  just punishment, deterrence, incapacitation, and rehabilitation."  Id. at 855.

The Court should not measure similarly situated defendants only in the pending litigation, but should look to similarly situated defendants in other cases as well. Amando-

Reyes v. United States, Case No. 1:12-cr-78, 2016 WL 8710422 (N.D.Ga. Mar. 18, 2016) ("§ 3553(a)(6) applies in order to cure unwarranted disparities between the defendant and **_all similar offenders in other cases_**, **_not just the case at bar_**") (emphasis added).

There are numerous other cases of similarly situated defendants convicted of financial fraud crimes upon which this Court can use as a basis for a variance or departure in order to avoid disparate treatment in imposing Karl's sentence:

♦ United States v. Barton, Case No. 3:21-cr-361-JMC, ECF # 25 (D.S.C. May 19, 2022). Defendant's Guidelines sentence, after pleading guilty to a $194,000 health care fraud, was level 15 with an 18 to 24 range of imprisonment. The defendant was granted a variance, and was sentenced to probation for five years and 300 hours community service.

♦ United States v. Nelson, Case No. 5:16-cr-800, ECF # 36 (W.D.Tex. Aug. 24, 2018). Defendant pleaded guilty of conspiracy to defraud the United States with respect to his participation in a Ponzi scheme, with a loss of about $6.3 million, and an apparent USSG recommended sentence range of 46 to 57 months incarceration (level 23). He was sentenced to 4 years' probation, no fine, and had to pay $6.3 million in restitution.

♦ United States v. Homann, Case No. 2:09-cr-724, ECF # 9 (D.N.J. Jan. 6, 2010). Defendant caused a $5 million sham loan, concealed about $6.1 million in an overseas account, and his adjusted offense level was 19.[20] He was sentenced to 5 years' probation plus 300 hours of community service.

♦ United States v. Oppold, Case No. 2:10-cr-569, ECF # 19 (D.S.C. Jan. 19, 2011). Defendant's Guidelines recommended sentence was, after pleading guilty to bank fraud, level 18 with a 27 to 33 range of imprisonment. The defendant was granted a departure, and was sentenced to probation and 18 months of home confinement.

♦ United States v. Holden, Case No. 3:13-cr-175, ECF # 53 (E.D.Tenn. Feb. 20, 2019). Defendant pleaded guilty to a $56 million rebate fraud conspiracy. Her plea agreement limited her loss calculation to those directly caused by her but not more than $1,000,000. She was sentenced to 2 years' probation.

♦ United States v. Kimble, Case No. 3:19-cr-277, ECF # 11 (D.S.C. Apr. 4, 2019). Defendant pleaded guilty to a § 371 conspiracy to commit healthcare fraud with an apparent Medicare loss amount of at least $40,000,000. Government has agreed to a probationary sentence for Defendant.

---

[20] https://www.justice.gov/opa/pr/ubs-client-pleads-guilty-failing-report-61-million-swiss-bank-accounts.

♦ <u>United States v. Jackson</u>, Case No. 3:20-cr-584, ECF # 25 (D.S.C. Aug. 10, 2021). Defendant pleaded guilty to misdemeanor healthcare fraud under the Anti-Kickback Statute for making false statements to the Medicare program. Defendant was a straw owner of a company involved with the above <u>Kimble</u> scheme. The loss amount attributable to this defendant was $124,180.88, and he was sentenced to probation for three years.

Clearly, granting Karl a variance to a probationary sentence and/or a home confinement would avoid unwarranted sentencing disparities particularly in light of the <u>Bradshaw</u> and <u>Cabral-Rice</u> cases.

### F.  Section 3553(a)(7)

The seventh factor in § 3553(a)(7) focuses on restitution. Karl paid restitution in full in the amount of $246,689.99 on the day of his guilty plea. Because the victim has been fully compensated, there is really no need to further punish Karl beyond probation and home confinement with community service.

### G.  Covid-19 Considerations

The Court is also requested to consider the U.S. Bureau of Prison's ("BOP") past history of handling the Covid-19 virus pandemic. As of November 18, 2021, of the 133,717 BOP inmates, 42,369 have been infected with and tested positive for the virus.[21] This represents an infection rate of over 31% of the BOP inmate population. Clearly, the BOP has not handled the pandemic well. The Center for Disease Control estimates that just over 14% of the total U.S. population has contracted the Covid-19 virus.[22] Indeed, the BOP director just recently resigned due to the poor handling of Covid cases, and as of January 6, 2022, 275 BOP inmates had died from Covid. [23] Given that the United States is

---

[21] www.bop.gov/coronavirus/ (2021-11-18 search date).
[22] https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (2021-11-18 search date; 47,244,379 cases ÷ 329,500,000 population = 14%).
[23] https://www.washingtonpost.com/national-security/2022/01/06/michael-carvajal-bureau-prisons-resigns/.

still in the throes of the pandemic, the BOP's poor record of controlling Covid-19 infections, Karl's well-documented heart condition, and the circumstances of this case, there is little need or justification for sending Karl to prison and potentially subjecting him to an increased threat of contracting the virus. Karl's cardiologist has expressed his concern about an incarceration sentence and the increased risk to Karl's health due to his heart problems. Published reports have indicated that cardiac "complications have been found to be prevalent in up to 30% of severe respiratory syndrome [Covid-19] patients."[24] So too, on November 1, 2021, Harvard published a study that found strong evidence that heart attack and stroke risks rise sharply in the weeks following a Covid-19 diagnosis.[25]

## I. Totality of the Circumstances Support a Variance

The Fourth Circuit affords a district judge discretion to find a sentence within the guidelines range substantively unreasonable based on "the totality of the circumstances" when analyzed under 3553(a) factors. United States v. Freeman, 992 F.3d 268, 278-79 (4th Cir. 2021). To advocate "for a particular sentence," a defendant must simply "communicate to the district court that the sentence is 'greater than necessary' in the proceedings below." Id. at 279 (quoting Holguin-Hernandez v. United States, 140 S. Ct. 762, 767, 206 L. Ed. 2d 95 (2020)).

Thus, the Court should analyze all of the Section 3553(a) factors as set forth above, in conjunction with the foregoing mitigating circumstances justifying a downward departure or variance, including but not limited to: (1) the non-violent nature of the unlawful conduct; (2) Karl's strong family ties and overwhelming community support; (3)

---

[24] https://www.researchgate.net/publication/343377913_Severe_coronary_spasm_in_a_COVID-19_patient.
[25] https://www.health.harvard.edu/heart-health/covid-19-diagnosis-raises-risk-of-heart-attack-stroke#:~:text=In%20one%20of%20the%20largest,COVID%2D19%20diagnosis.

Karl's post-arrest rehabilitation (volunteer/community services, care-taking for his mother and grandson, deeply expressed remorse); (4) Karl's extraordinary acceptance of responsibility in the form of full restitution paid; (5) the atypical nature of his misconduct; (6) the lack of a threat or danger to the community; (7) the low risk of recidivism; (8) the lack of a need to rehabilitate Karl by imprisonment; (9) the need to avoid a disparity in sentencing; (10) a Guidelines sentence of any incarceration is a substantial overstatement of the seriousness of the offense; (11) a Guidelines sentence of any incarceration is greater than necessary to promote the purposes of federal sentencing; (12) Karl's exceptional pre-arrest civic/charitable/volunteer good works and community service; (13) Karl's certain loss of his real estate license and public humiliation; (14) Karl's exceptional military service; (15) Karl's exemplary past employment; (16) the good results the veterans received; (17) Karl's long-standing heart/medical condition; and, (18) the BOP's poor record of handling Covid-19. Given the foregoing, a variance from a Guidelines sentence to probation and home confinement is warranted.

## VI.    CONCLUSION

Based on the foregoing authorities, arguments, and evidence to be presented at the sentencing hearing, Karl respectfully requests that this Motion be granted and that the Court impose a sentence of probation and home confinement, with appropriate conditions.

Respectfully submitted,

s/ *Joseph P. Griffith, Jr.*
Joseph P. Griffith, Jr., Esquire (#2473)
946 Johnnie Dodds Boulevard
Mt. Pleasant, South Carolina 29464
(843) 225-5563 (Telephone)
joegriffithjr@hotmail.com

Charleston, S.C.
May 23, 2022                          Attorney for the Defendant